IN THE UNITED STATES DISTRICT COURT
FOR THE NORTHERN DISTRICT OF TEXAS
WICHITA FALLS DIVISION

| | |
|---|---|
| RHONDA M. VAIL, § | |
| § | |
| Plaintiff, § | |
| § | |
| v. § | |
| § | Civil Action No. 7:03-CV-201-BH (R) |
| JO ANNE B. BARNHART, § | |
| COMMISSIONER OF SOCIAL § | |
| SECURITY, § | |
| § | |
| Defendant. § | |

**MEMORANDUM OPINION AND ORDER**

Pursuant to the provisions of Title 28, United States Code, Section 636(c), and an Order of the Court in implementation thereof, subject cause has been transferred to the undersigned United States Magistrate Judge. Before this Court are *Plaintiff's Opening Brief*, filed April 19, 2004, *Defendant's Brief in Response to Plaintiff's Brief*, filed June 21, 2004, and *Plaintiff's Reply Brief*, filed July 19, 2004. Having reviewed the evidence of the parties in connection with the pleadings, the undersigned is of the opinion that the final decision of the Commissioner should be **AFFIRMED**.

## I. BACKGROUND[1]

*A.    Procedural History*

Rhonda Vail ("Plaintiff") seeks judicial review of a final decision by the Commissioner of Social Security ("Commissioner") denying her claim for disability benefits. Plaintiff filed an

---

[1] The following background comes from the transcript of the administrative proceedings, which is designated as "Tr."

application for disability benefits under Title II and Title XVI of the Social Security Act on September 28, 2000. (Tr. at 92.) Plaintiff claimed she was disabled due to fibromyalgia. (Tr. at 107.) Her application also indicates that she received treatment for anxiety, migraines, severe pain in her thumb and fingers, and an inability to "think straight." (Tr. at 107; 109-11; 114-15.) Plaintiff's application was denied initially and upon reconsideration. (Tr. at 67-72, 74-76.) Plaintiff timely requested a hearing before an Administrative Law Judge ("ALJ"). (Tr. at 77.) A hearing, at which Plaintiff personally appeared and testified, was held on March 21, 2002. (Tr. at 35-64.) On April 25, 2003, the ALJ issued her decision finding Plaintiff not disabled. (Tr. at 32.) The Appeals Council denied Plaintiff's request for review, concluding that the information contained in Plaintiff's request for review did not provide a basis for changing the ALJ's decision. (Tr. at 6-9.) Thus, the ALJ's decision became the final decision of the Commissioner. (Tr. at 7.) Plaintiff timely appealed the Commissioner's decision to the United States District Court pursuant to 42 U.S.C. § 405(g) on September 30, 2003.

*B.     Factual History*

1.     Age, Education, and Work Experience

Plaintiff was born on August 10, 1954. (Tr. at 91.) She graduated from high school and attended a junior college for part of one term before leaving the program. (Tr. at 56-57, 113, 127.) At the time of the hearing, Plaintiff cleaned approximately five houses a week, and had been doing so for approximately 2 years. (Tr. at 39-40.) Prior to that, Plaintiff had been a housewife and had not worked outside the home in fifteen years. (Tr. at 40.)

2.  Medical Evidence[2]

On May 5, 1997, Plaintiff sought treatment from Richard Pena, M.D., a rheumatologist, for chronic pain. (Tr. at 174-81.) She complained of having experienced pain over the previous twenty years. (Tr. at 174.) She reported that she initially felt the pain in her neck and shoulders but now felt it constantly, in her legs, especially the thighs, as well as occasional pain in her elbows and wrists. *Id*. She also reported that the bottoms of her feet were burning and that she had a regularly irritated throat. *Id*. Dr. Pena's impression was that Plaintiff had probable osteoarthritis, especially in her right hip, and probable fibromyalgia. (Tr. at 177.) Plaintiff was prescribed Dolobid and Flexeril. *Id.* On May 19, 1997, Dr. Pena noted that Dolobid was not helping, and started her on Daypro. (Tr. at 173.)

Plaintiff was seen by Rosa A. Torres, M.D. on August 19, 1997, for an annual exam. (Tr. at 215.) Plaintiff reported a history of fibromyalgia and osteoarthritis. *Id.* Dr. Torres prescribed Elavil for fibromyalgia. *Id.*

On December 3, 1998, Plaintiff was examined by Ruth E. Gonzalez ("Gonzalez"), M.D., a rheumatologist. (Tr. at 189, 203-04.) Plaintiff complained of cervical spine pain radiating to her shoulders, bilateral base of the thumb pain, and bilateral ankle pain. (Tr. at 203.) Plaintiff had been taking Aleve and Tylenol for her diffuse muscle pain with no improvement. *Id.* Examination revealed full range of motion of the hips, swelling of the proximal interphalangeal ("PIP") joint of a finger on the left hand, mild bilateral medial wrist tenderness without swelling, bilateral epicondylar tenderness, and bilateral medial knee pain. (Tr. at 204.) In her assessment of Plaintiff,

---

[2] As Plaintiff's appeal of the Commissioner's decision is limited to the findings regarding her hands, the Court will tailor its recitation of the evidence to focus primarily on that medical evidence pertaining specifically to limitations with Plaintiff's hands. *See* Pl.'s Br. at 6.

Dr. Gonzalez wrote that Plaintiff "had been presenting with chronic fatigue, diffuse soft tissue pain and episodes of bilateral heel pain[.]" (Tr. at 189.) Dr. Gonzalez recommended a number of tests, including x-rays, blood work, and urinalysis, noting that "[w]ith her strong family history of lupus and inflammatory bowel disease, it is important to rule out connective tissue disease as the cause of her arthralgias and myalgias versus seronegative arthropathy[.]" *Id*. Plaintiff received a prescription for Klonopin at night to treat "insomnia with suspected fibromyalgia[.]" *Id*.

Dr. Gonzalez saw Plaintiff again on January 25, 1999, for treatment of fibromyalgia and left thumb tendinitis. (Tr. at 190.) Plaintiff stated that she had "been experiencing significant pain in her left thumb associated with swelling of the PIP joint." *Id*. She also reported "having low energy and fatigue associated with sleep problems." *Id*. A musculoskeletal examination revealed a "[l]eft 1st PIP joint Bouchard nodules with redness and significant pain." *Id*. Plaintiff received an injection of Kenalog in her thumb, and a prescription for Zoloft to treat fibromyalgia. *Id*. On March 22, 1999, Plaintiff saw Dr. Gonzalez for arthralgias and myalgias, fibromyalgia, and recurrent left thumb tendinitis, as well as low energy associated with sleep problems and diffuse trigger point. (Tr. at 188.) A physical examination revealed a diffuse soft tissue trigger point but no joint redness or swelling. *Id*. Plaintiff was instructed to continue with 50 mg of Zoloft twice daily as well as aquatic exercises and weekly soft massage. *Id*.

Dr. Gonzalez treated Plaintiff on May 1, 2000, for recurrent bilateral thumb tendinitis with osteoarthritis of the hands and fibromyalgia syndrome. (Tr. at 186.) In a physical examination, Dr. Gonzalez noted the bilateral tenderness at the base of the thumb and the presence of Bouchard nodules at the PIP joint. Id. Dr. Gonzalez observed that "[e]ven though her previous hand x-rays were normal, there is clinical evidence of Bouchard and Heberden nodules compatible with possible

erosive osteoarthritis." Id.  On the basis of these findings, Dr. Gonzalez recommended the use of 200 milligrams of Celebrex per day as well as the use of a left thumb splint.  Id.

On May 22, 2000, Dr. Gonzalez treated Plaintiff for moderate to severe left thumb pain.  (Tr. at 185.)  Plaintiff had discontinued Celebrex due to cost.  *Id.*  An examination revealed "[l]eft first PIP joint Bouchard nodules with severe pain[.]" *Id.*  Plaintiff received a steroid injection in her thumb and additional samples of Celebrex.  *Id.*

Plaintiff saw Dr. Gonzalez for re-evaluation on September 18, 2000.  (Tr. at 182.)  Plaintiff complained of "having significant fatigue and low energy" and difficulty concentrating in the classes in which she had enrolled.  *Id*.  In addition, she complained of suboccipital headaches, diffuse costochondral pain, and gastrointestinal problems.  *Id.*  Additionally, she complained of bilateral thumb pain, more on the left side, associated with PIP and distal interphalangeal ("DIP") stiffness.  *Id*.  Dr. Gonzalez examined Plaintiff and found bilateral base of thumb crepitus with tenderness and symmetrically decreased grip strength.  *Id*.  In Dr. Gonzalez's opinion, fibromyalgia explained the majority of Plaintiff's symptoms.  (Tr. at 183.)  For treatment, Dr. Gonzalez prescribed 100 milligrams of Zoloft and Aleve, twice a day, as Plaintiff had never filled her prescription for Celebrex.  *Id*.

Plaintiff was examined by Jerome M. Adams, M.D., a consultative examiner, on April 6, 2001.  (Tr. at 269-70.)  Examination of Plaintiff's upper extremities revealed a full handgrip with a bit of weakness.  (Tr. at 269.)  Dr. Adams noted no joint changes, joint deformities, redness, or inflammation.  *Id.*  Dr. Adams stated that Plaintiff "would present the expected findings for a diagnosis of fibromyalgia in that she presents very extensive severe chronic long term musculoskeletal symptoms, but very sparse positive physical findings."  (Tr. at 270.)  Dr. Adams

ordered x-rays of Plaintiff's right hand only, which demonstrated no significant degenerative changes but some "soft tissue swelling about the third proximinal interphalangeal joint." (Tr. at 271.)

On August 10, 2001, Plaintiff was examined by Robert Schall, M.D. (Tr. at 301.) Dr. Schall noted some swelling and probable increased bony density over Plaintiff's PIP joints. *Id.* Plaintiff was prescribed Celebrex. *Id.*

On June 20, 2003, Plaintiff was seen at the Community Healthcare Center and complained of pain and stiffness in her hip and a burning sensation in the joints of her hands. (Tr. at 313.) Plaintiff had increased pain upon palpation. *Id.* Plaintiff was diagnosed with osteoarthritis and prescribed Bextra. *Id.*

### 3. Hearing Testimony

Plaintiff's hearing took place on March 21, 2002. (Tr. at 35.) The ALJ heard testimony from Plaintiff and a vocational expert, Robert Sanders. *Id.* Plaintiff was represented by a non-attorney representative at the hearing. *Id.*

Plaintiff testified that she was born on August 10, 1954. (Tr. at 38.) She stated that she was right handed. *Id.* Plaintiff completed high school. (Tr. at 39.) Plaintiff started classes to be a medical transcriptionist, but stopped due to her physical and mental limitations. (Tr. at 56-57.)

She stated she had been working cleaning one house per day for approximately two years. (Tr. at 39-40.) She estimated that she spent three hours a day working. (Tr. at 41.) Plaintiff drove herself to the homes she cleaned. (Tr. at 40.) Prior to that time, Plaintiff had not worked. *Id.* On some days, Plaintiff's health prevented her from working, so she stayed at home and rested. *Id.*

Plaintiff testified that she was diagnosed with fibromyalgia ten years previously. (Tr. at 43.)

Her symptoms included severe pain, especially in her joints. *Id.* Although Plaintiff acknowledged that objective testing of the joints had not revealed a problem, she stated that a lack of objective findings was common with fibromyalgia. (Tr. at 44.) Plaintiff stated that she had not seen a rheumatologist in two years due to financial reasons. (Tr. at 44-45.) Plaintiff was treating her symptoms with over the counter medications because the prescription medications bothered her stomach. (Tr. at 45.)

Plaintiff stated that she had swelling in the joints of her hands and severe problems with her left thumb, requiring numerous cortisone shots. (Tr. at 46.) Plaintiff also had problems with her right thumb, but not as severe as those in the left. *Id.*

Plaintiff testified that she had to pace herself due to her limitations. (Tr. at 52.) When cleaning houses, Plaintiff did not perform any heavy lifting or window cleaning. *Id.* She did laundry for one household and she vacuumed, dusted, and made beds. (Tr. at 52-53.) When asked to describe why she was unable to work, Plaintiff cited pain in her joints, feet, hip, and headaches. (Tr. at 54.)

The Vocational Expert ("VE") stated that Plaintiff had no significant work other than as a homemaker in the previous fifteen years. (Tr. at 58.) The VE was asked to assume a hypothetical individual who could perform simple and moderately detailed light work, modified by a total of standing/walking for four hours in a workday. (Tr. at 59.) The VE testified that such an individual could perform the jobs of storage facility clerk, mail room clerk, and document preparer. *Id.* When asked about an individual further limited by the inability to work with the general public, the VE stated that such a limitation would have a significant impact on the ability to perform the job of storage facility clerk, but that such an individual would still be able to perform the jobs of document

preparer and mail clerk. (Tr. at 60.)

## C.     *ALJ's Findings*

The ALJ issued her decision denying benefits on April 25, 2003. (Tr. at 13-32.) In her findings, she determined that Plaintiff had not engaged in substantial gainful employment at any time relevant to the decision, although she noted that Plaintiff had been inconsistent in reporting her past work. (Tr. at 18.) The ALJ also determined that Plaintiff had severe impairments which did not meet or equal a listed impairment. (Tr. at 26.)

In determining Plaintiff's residual functional capacity ("RFC"), the ALJ noted that Plaintiff's credibility was negatively impacted by her inconsistency in reporting her work history, the fact that laboratory tests were largely negative, the fact that Plaintiff had not always followed up with treatment, and her finding that Plaintiff had significant economic incentive to obtain disability. (Tr. at 27.) However, the ALJ also found that Plaintiff's reports of her symptoms were fairly consistent. *Id.* The ALJ determined that Plaintiff retained the RFC to perform the exertional demands of a range of range of light work and sedentary work. (Tr. at 29.) Specifically, the ALJ found that Plaintiff could stand and/or walk for four hours in an 8 hour work day, could sit as required, could occasionally lift and/or carry objects weighing twenty pounds and frequently lift and/or carry objects weighing ten pounds. (Tr. at 28.) Plaintiff could perform simple and moderately detailed work, but could not work with the general public. *Id.* The ALJ relied upon the testimony of the VE and found that Plaintiff could perform the jobs of mail clerk and document preparer. (Tr. at 30.) As a result, the ALJ determined that Plaintiff was not disabled within the meaning of the Social Security Act. *Id.*

## II.  ANALYSIS

**A.   Legal Standards**

    1.   <u>Standard of Review</u>

Judicial review of the Commissioner's denial of benefits is limited to whether the Commissioner's position is supported by substantial evidence and whether the Commissioner applied proper legal standards in evaluating the evidence. *Greenspan v. Shalala*, 38 F.3d 232, 236 (5th Cir. 1994); 42 U.S.C. § 405(g), 1383(C)(3). Substantial evidence is defined as more than a scintilla, but less than a preponderance, and as being such relevant and sufficient evidence as a reasonable mind might accept as adequate to support a conclusion. *Leggett v. Chater*, 67 F.3d 558, 564 (5th Cir. 1995). In applying the substantial evidence standard, the reviewing court does not reweigh the evidence, retry the issues, or substitute its own judgment, but rather, scrutinizes the record to determine whether substantial evidence is present. *Greenspan*, 38 F.3d at 236. A finding of no substantial evidence is appropriate only if there is a conspicuous absence of credible evidentiary choices or contrary medical findings to support the Commissioner's decision. *Johnson v. Bowen*, 864 F.2d 340, 343-44 (5th Cir. 1988).

The scope of judicial review of a decision under the supplemental security income program is identical to that of a decision under the social security disability program. *Davis v. Heckler*, 759 F.2d 432, 435 (5th Cir. 1985). Moreover, the relevant law and regulations governing the determination of disability under a claim for disability insurance benefits are identical to those governing the determination under a claim for supplemental security income. *See id.* Thus, the Court may rely on decisions in both areas without distinction in reviewing an ALJ's decision. *See id.*

2.Disability Determination

To be entitled to social security benefits, a claimant must prove that he or she is disabled as defined by the Social Security Act. *Leggett*, 67 F.3d at 563–64; *Abshire v. Bowen*, 848 F.2d 638, 640 (5th Cir. 1988). The definition of disability under the Social Security Act is "the inability to engage in any substantial gainful activity by reason of any medically determinable physical or mental impairment which can be expected to result in death or which has lasted or can be expected to last for a continuous period of not less than 12 months." 42 U.S.C. § 423(d)(1)(A); *Anthony v. Sullivan*, 954 F.2d 289, 292 (5th Cir. 1992).

The Commissioner utilizes a sequential five-step inquiry to determine whether a claimant is disabled:

1.An individual who is working and engaging in substantial gainful activity will not be found disabled regardless of medical findings.

2.An individual who does not have a "severe impairment" will not be found to be disabled.

3.An individual who "meets or equals a listed impairment in Appendix 1" of the regulations will be considered disabled without consideration of vocational factors.

4.If an individual is capable of performing the work he has done in the past, a finding of "not disabled" must be made.

5.If an individual's impairment precludes him from performing his past work, other factors including age, education, past work experience, and residual functional capacity must be considered to determine if work can be performed.

*Wren v. Sullivan*, 925 F.2d 123, 125 (5th Cir. 1991) (summarizing 20 C.F.R. § 404.1520(b)-(f)). Under the first four steps of the inquiry, the burden lies with the claimant to prove disability. *Leggett*, 67 F.3d at 564. The inquiry terminates if the Commissioner determines at any point during the first four steps that the claimant is disabled or is not disabled. *Id*. Once the claimant satisfies

his or her burden under the first four steps, the burden shifts to the Commissioner at step five to show that there is other gainful employment available in the national economy that the claimant is capable of performing. *Greenspan v. Shalala*, 38 F.3d 232, 236 (5th Cir. 1994). This burden may be satisfied either by reference to the Medical-Vocational Guidelines of the regulations or by expert vocational testimony or other similar evidence. *Fraga v. Bowen*, 810 F.2d 1296, 1304 (5th Cir. 1987). A finding that a claimant is not disabled at any point in the five-step review is conclusive and terminates the analysis. *Lovelace v. Bowen*, 813 F.2d 55, 58 (5th Cir. 1987).

### B.   *Issues for Review*

Plaintiff alleges that substantial evidence does not support the Commissioner's finding that she was not disabled because:

(1) The ALJ failed to properly consider Plaintiff's nonexertional hand impairment;

(2) The ALJ erred in failing to accord controlling weight to the opinion of Plaintiff's treating specialist; and

(3) The ALJ erred in failing to include a hand impairment in her hypothetical question to the VE.

### C.   *Issue One: Consideration of Plaintiff's hand impairment*

Plaintiff argues that the ALJ erred because she "did not include arthritis or any other hand impairment among Plaintiff's severe impairments." (Pl.'s Br. at 9.) Plaintiff concedes that the ALJ thoroughly discussed the medical evidence in her decision and specifically noted the evidence pertaining to Plaintiff's hands. (Pl.'s Br. at 6, 9.) However, Plaintiff asserts error from the failure to find the limitation to be severe. *Id.*

Social Security Ruling 96-3p provides in part that:

At step 2 of the sequential evaluation process, an impairment or combination of impairments is considered "severe" if it significantly limits an individual's physical

>or mental abilities to do basic work activities; an impairment(s) that is "not severe" must be a slight abnormality (or a combination of slight abnormalities) that has no more than a minimal effect on the ability to do basic work activities. . . . A determination that an individual's impairment(s) is not severe requires a careful evaluation of the medical findings that describe the impairment(s) (i.e., the objective medical evidence and any impairment-related symptoms), and an informed judgment about the limitations and restrictions the impairment(s) and related symptom(s) impose on the individual's physical and mental ability to do basic work activities.

SSR 96-3p. "An impairment can be considered as not severe only if it is a slight abnormality having such minimal effect on the individual that it would not be expected to interfere with the individual's ability to work, irrespective of age, education or work experience." *Stone v. Heckler*, 752 F.2d 1099, 1101 (5th Cir. 1985). A diagnosis alone is not a sufficient basis for a finding that an impairment is severe. *Sellers v. Barnhart*, 246 F. Supp. 2d 1201, 1211 (M.D. Ala. 2002). "The severity of a medically ascertained impairment must be measured in terms of its effect upon ability to work and not simply in terms of deviation from purely medical standards of bodily perfection or normality." *Id.* (citing *McCruter v. Bowen*, 791 F.2d 1544, 1547 (11th Cir. 1986)). "Objective medical evidence must confirm that the impairment is severe." *Id.* (citing SSR 96-3p).

As noted above, the ALJ made a thorough review of the medical evidence, noting specifically Plaintiff's treatment for pain in her hands. (Tr. at 18-25.) Although the ALJ did not detail which of Plaintiff's several impairments she found to be severe, she noted fibromyalgia, affective disorders, anxiety related disorders, musculoskeletal disorders, immune diseases, gastrointestinal disorders, neurological disorders, and mental disorders generally in considering whether Plaintiff met or equaled a listed impairment. (Tr. at 25.) Although arthritis is encompassed in the listings for musculoskeletal disorders, because the ALJ did not specifically mention arthritis as a severe impairment, the Court will assume that Plaintiff is correct in stating that the ALJ found Plaintiff's arthritis not severe. *See* 20 C.F.R. Pt. 404, Subpt. P, App. 1.

Considering the relevant evidentiary facts and applicable standards, substantial evidence supports a conclusion that Plaintiff's arthritis was not a severe impairment. Nothing in the record indicates Plaintiff's arthritis was more than a slight abnormality with more than a minimal effect on her ability to perform basic work activities. Plaintiff did not seek regular treatment for arthritis in her hands and appeared to achieve good results on the occasions she did so. Plaintiff received a steroid injection in her left thumb for tendinitis on January 25, 1999, and did not complain again of pain in her hands until May 1, 2000. (Tr. at 186, 190.) At that time she was again treated with an injection and was prescribed Celebrex and a thumb splint. (Tr. at 186.) Her treating physician noted possible erosive osteoarthritis. *Id.* Plaintiff did not take Celebrex as prescribed due to financial concerns and returned with severe left thumb pain on May 22, 2000. (Tr. at 185.) She was again treated with a steroid injection and given Celebrex. *Id.* Plaintiff still complained of bilateral thumb pain at a visit on September 18, 2000. (Tr. at 182.) She exhibited bilateral thumb crepitus with tenderness and symmetrically decreased grip strength. *Id.* It was noted that Plaintiff was not taking any medication for this, and she was advised to take Aleve. (Tr. at 183.) Plaintiff next sought treatment for her hand on August 10, 2001, when she had some swelling and probable increased bony density over her PIP joints and was prescribed Celebrex. (Tr. at 301.) Plaintiff did not seek treatment for hand pain again until June 20, 2003, when she was prescribed Bextra for osteoarthritis. (Tr. at 313.) There is no indication in any of the physicians' treatment notes that Plaintiff's hand impairment was interfering significantly with her activities of daily living. In fact, in spite of Plaintiff's hand pain, she was able to drive, clean, do laundry, vacuum, and make beds. (Tr. at 52-53.) Plaintiff did not meet her burden to show that her hand impairment was severe in that it was more than a slight abnormality with more than a minimal effect on her ability to perform basic work

activities. Accordingly, the Court finds that substantial evidence supports the ALJ's determination at step two that Plaintiff's hand limitation was not severe.

### D.      *Issue Two: Weight accorded to the opinion of Plaintiff's treating specialist*

Plaintiff claims that the ALJ erred in failing to acknowledge Dr. Gonzalez's diagnosis of erosive arthritis in the hands, concluding that Plaintiff had no hand impairment. (Pl.'s Br. at 9.)

An ALJ is required to evaluate every medical opinion received and set forth the weight given those opinions. 20 C.F.R. § 404.1527(d); *Newton*, 209 F.3d at 453. "A treating physician's opinion on the nature and severity of a patient's impairment will be given controlling weight if it is 'well-supported by medically acceptable clinical and laboratory diagnostic techniques and is not inconsistent with . . . other substantial evidence.'" *Martinez v. Chater*, 64 F.3d 172, 176 (5th Cir. 1995) (citing 20 C.F.R. § 404.1527(d)(2)). However, if good cause exists, an ALJ may give a treating physician's opinions little or no weight. *Newton*, 209 F.3d at 455. "Good cause may permit an ALJ to discount the weight of a treating physician relative to other experts where the treating physician's evidence is conclusory, is unsupported by medically acceptable clinical, laboratory, or diagnostic techniques, or is otherwise unsupported by the evidence." *Id*. at 456. Thus, "[t]he treating physician's opinions are not conclusive." *Id*. at 455. "Even though the opinion and diagnosis of a treating physician should be afforded considerable weight in determining disability, 'the ALJ has the sole responsibility for determining a claimant's disability status.'" *Martinez*, 64 F.2d at 176 (quoting *Moore v. Sullivan*, 919 F.2d 901, 905 (5th Cir. 1990)). "[T]he ALJ is free to reject the opinion of any physician when the evidence supports a contrary conclusion." *Martinez*, 64 F.2d at 176 (quoting *Bradley v. Bowen*, 809 F.2d 1054, 1057 (5th Cir. 1987)).

The Fifth Circuit in *Newton* held that "absent reliable medical evidence from a treating or

examining physician controverting the claimant's treating specialist, an ALJ may reject the opinion of the treating physician only if the ALJ performs a detailed analysis of the treating physician's views under the criteria set forth in 20 C.F.R. § 404.1527(d)(2)." 209 F.3d at 455. Thus, before deciding not to give any weight to a treating physician's opinion, an ALJ must consider: (1) the physician's length of treatment of the claimant; (2) the physician's frequency of examination; (3) the nature and extent of the treatment relationship; (4) the support of the physician's opinion afforded by the medical evidence of record; (5) the consistency of the opinion with the record as a whole; and (6) the specialization of the treating physician. *Newton*, 209 F.3d at 456 (citing 20 C.F.R. § 1527(d)(2)). If the ALJ fails to consider the requisite criteria, the case must be remanded. *Locke v. Massanari*, 285 F. Supp.2d 784, 795 (S.D. Tex. 2001). However, the court expressly excluded from the scope of *Newton* cases "where there is competing first-hand medical evidence and the ALJ finds as a factual matter that one doctor's opinion is more well-founded than another" and cases in which "the ALJ weighs the treating physician's opinion on disability against the medical opinion of other physicians who have treated or examined the claimant and have specific medical bases for a contrary opinion." *Newton*, 209 F.3d at 458. Thus, "*Newton* is limited to circumstances where the administrative law judge summarily rejects the opinions of a claimant's treating physician, based only on the testimony of a non-specialty medical expert who had not examined the claimant." *Contreras v. Massanari*, 2001 WL 520815, at *4 (N.D. Tex. May 14, 2001); *see also Newton*, 209 F.3d at 458; *Pedraza v. Barnhart*, 2003 WL 22231292, at *5 (W.D. Tex. Sept. 15, 2003).

First, the Court notes again that the ALJ's decision contains a very thorough review of the medical evidence in the record, including the evidence pertaining to Plaintiff's hands. There is no indication in the ALJ's decision that she summarily rejected the findings and opinions of Dr.

Gonzalez. Although the ALJ's findings do not specifically mention the assessment that clinical evidence was compatible with erosive osteoarthritis, the findings do discuss in detail Plaintiff's complaints of hand pain and the treatment prescribed by Dr. Gonzalez. (Tr. at 19-20.) This not a case where the ALJ discounted the opinion of the treating physician. Rather, as noted above, the ALJ concluded that Plaintiff's arthritis was not a severe impairment and her recitation of the medical evidence focuses more on the diagnoses of Plaintiff's recognized severe impairments of fibromyalgia, depression, and bipolar disorder. For these reasons, the Court finds that the ALJ properly accorded appropriate weight to the diagnosis and opinions of Dr. Gonzalez

### E.     *Issue Three: Failure to include a hand impairment in the hypothetical to the VE*

Lastly, Plaintiff asserts that the ALJ erred in failing to include a hand impairment in her hypothetical to the VE. (Pl.'s Br. at 10-11.)

The ALJ has a duty to fully and fairly develop the facts relevant to a claim for benefits. *Carey v. Apfel*, 230 F.3d 131, 142 (5th Cir. 2000). Failure to develop an adequate record is not *per se* grounds for reversal, however. *Kane v. Heckler*, 731 F.2d 1216, 1220 (5th Cir. 1984). Plaintiff must show that Plaintiff "could and would have adduced evidence that might have altered the result." *Id.*

To establish that work exists for a claimant, the ALJ relies on the medical-vocational guidelines or the testimony of a VE in response to a hypothetical question. *Bowling v. Shalala*, 36 F.3d 431, 435 (5th Cir. 1994). A hypothetical question posed by an ALJ to a VE must reasonably incorporate all the claimant's disabilities recognized by the ALJ and the claimant must be afforded a fair opportunity to correct any deficiencies in the hypothetical question. *Bowling*, 36 F.3d at 436. A claimant's failure to point out deficiencies in a hypothetical question does not "automatically

salvage that hypothetical as a proper basis for a determination of non-disability." *Boyd v. Apfel*, 239 F.3d 698, 707 (5th Cir. 2001). If, in making a disability determination, the ALJ relied on testimony elicited by a defective hypothetical question, the ALJ did not carry her burden of proof to show that despite his impairment the claimant could perform available work. *Id.* at 708.

Here, the VE was asked to assume a hypothetical individual who could perform simple and moderately detailed light work, modified by a total of standing/walking for four hours in a workday. (Tr. at 59.) The individual was further limited by the inability to work with the general public. (Tr. at 59-60.) In response to the questions, the VE stated that such an individual would be able to perform the jobs of document preparer and mail clerk. (Tr. at 60.)

In setting forth Plaintiff's RFC, the ALJ did not include any manipulative limitations. Rather, the ALJ found that Plaintiff could stand and/or walk for four hours in an 8 hour work day, could sit as required, could occasionally lift and/or carry objects weighing twenty pounds and frequently lift and/or carry objects weighing ten pounds. (Tr. at 28.) Plaintiff could perform simple and moderately detailed work, but could not work with the general public. *Id.* The ALJ incorporated the RFC in the hypothetical question posed to the VE. Thus, because the hypothetical question reasonably incorporated all of the limitations recognized by the ALJ, the question was not in error. *Morris v. Bowen*, 864 F.2d 333, 336 (5th Cir. 1988).

### III. CONCLUSION

For the foregoing reasons, the final decision of the Commissioner is **AFFIRMED**.

**SO ORDERED**, this 24th day of August, 2006.

IRMA CARRILLO RAMIREZ
UNITED STATES MAGISTRATE JUDGE